THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH:<br><br>**FACEBOOK GROUP USER ID 533180143495742 THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC.** | Case No. 22-SW-2169-DPR |

### AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Stacey Lee Moore, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice ("DOJ"), and I am currently assigned to the Joplin, Missouri, Resident Agency of the FBI's Kansas City, Missouri, Division. As such, I am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

2. As part of my duties with FBI, I investigate criminal violations of Title 18 of the United States Code, including violations of 18 U.S.C. § 1201, that is, kidnapping resulting in death, and 18 U.S.C. § 3, that is, accessory after the fact to kidnapping resulting in death.

3. I make this affidavit in support of an application for a search warrant for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1201, and 3, which relate to kidnapping resulting in death and accessory after the fact to kidnapping resulting in death, associated with a Facebook Group with the user ID **533180143495742**, that is stored at premises owned, maintained, controlled, and/or operated by Meta Platforms, Inc. ("Meta"), formerly known as Facebook, a social networking company headquartered in Menlo Park, California, in the Northern District of California. The property to be searched is described in the

following paragraphs and in Attachment A. I request authority to search and/or examine the seized items, specified in Attachment B, as instrumentalities, fruits, and evidence of crime.

4. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID **533180143495742**.

5. I have probable cause to believe that evidence of violations of 18 U.S.C. §§ 1201, and 3, is located within the aforementioned property described below. Thus, as outlined below, and based on my training and experience, there is probable cause to believe that evidence, fruits, and/or instrumentalities of the aforementioned crimes are located within this property.

6. The statements in this affidavit are based on my personal observations, my training and experience, my investigation of this matter, and information obtained from other agents and witnesses. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth the facts that I believe necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1201, and 3 are currently located within Facebook user ID **533180143495742**.

## STATUTORY AUTHORITY

7. Title 18, United States Code, Section 1201(a)(1) prohibits any person from unlawfully seizing, confining, inveigling, decoying, kidnapping, abducting, or carrying away and holding for ransom or reward or otherwise any person, or attempting to do so, except in the case of a minor by the parent thereof, which occurs when the person is willfully transported in interstate or foreign commerce, regardless of whether the person was alive when transported across a State

boundary, or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.

8. Title 18, United States Code, Section 3 prohibits any person who, knowing that an offense against the United States has been committed, from receiving, relieving, comforting or assisting the offender in order to hinder or prevent her apprehension, trial or punishment.

## PROBABLE CAUSE

9. On October 31, 2022, at approximately 6:30 p.m., Ashley Bush (Ms. Bush) was reported as a missing person to the Benton County, Arkansas Sheriff's Office by her fiancé, Joshua Willis (Mr. Willis). Mr. Willis reported that he had last seen Ms. Bush in the passenger seat of an older model, tan pickup truck on October 31, 2022, at the intersection of Highway 72 and Highway 43 in Maysville, Arkansas. Mr. Willis described the driver of the vehicle as a white female in her 40's, with shoulder length brown hair, whom Mr. Willis knew as "Lucy." Mr. Willis advised that Ms. Bush was approximately 31 weeks pregnant.

10. Mr. Willis informed Benton County Sheriff's Office investigators that on October 28, 2022, he and Ms. Bush met "Lucy" at the Gravette, Arkansas, public library. "Lucy" was driving the same older model tan pickup truck he had observed her in on October 31, 2022. During this meeting, Ms. Bush and "Lucy" discussed employment opportunities for Ms. Bush at a company called Conduent. Later in the evening, "Lucy" messaged Ms. Bush and told her that she wanted Ms. Bush to meet her supervisor at Conduent in Bentonville, Arkansas, on Monday, October 31, 2022, at 9:00 a.m. At approximately 11:00 p.m., on October 28, 2022, "Lucy" again messaged Ms. Bush and informed her that she would meet Ms. Bush at the Handi-Stop convenience store located in Maysville, Arkansas, on Monday, October 31, 2022, to take Ms. Bush

to meet her supervisor at Conduent.

11. On October 31, 2022, Mr. Willis drove Ms. Bush to the Handi-Stop convenience store where Ms. Bush met "Lucy." Mr. Willis noted that "Lucy" was driving the same pickup truck that he had observed on October 28, 2022. At approximately 3:00 p.m., Mr. Willis received a text message from Ms. Bush stating that she was in Gravette, Arkansas, and on her way to the Handi-Stop convenience store where she had arranged to be picked up. Mr. Willis reported to the Benton County Sheriff's Office that while he was waiting for Ms. Bush to arrive, he observed the same older model pickup truck drive past the Handi-Stop convenience store and turn on to Highway 43 and travel north. Mr. Willis was able to observe that Ms. Bush was the passenger in the vehicle and that "Lucy" was driving. Mr. Willis attempted to contact Ms. Bush by phone but reported that the calls were going to voice mail.

12. On November 1, 2022, Benton County Sheriff's Office detectives met with Mr. Willis in Maysville, Arkansas. During this meeting, Mr. Willis informed the detectives that he had located Ms. Bush's cellular telephone on the side of Highway 43 in Maysville, Arkansas. Mr. Willis directed the detectives to the location where the telephone was located. The detectives recovered the phone and obtained the access code from Mr. Willis. Data obtained from Ms. Bush's cellular service provider indicated that the telephone had been transported from Maysville, Arkansas, to a location in Pineville, Missouri, and then returned to Maysville, Arkansas, several hours later.

13. When Benton County Sheriff's Office Detective Simpson returned Mr. Willis to the Handi-Stop convenience store, he was approached by Rick Burrow. Burrow told Detective Simpson that on October 31, 2022, he and Sawyer McGee were traveling south on Highway 43 near Maysville, Arkansas. While driving, he and McGee observed an unknown male subject throw

a red and black cellular telephone from the window of his vehicle as the vehicle traveled north on Highway 43. Detective Simpson made contact with McGee who confirmed the information provided by Burrow and added that the vehicle in question was a blue or light gray Chevrolet pickup truck.

14. While reviewing Ms. Bush's phone, detectives were able to locate a Facebook account for "Lucy." The account appeared to have been created on October 25, 2022, and the profile name was identified as "Lucy Barrow." Detectives located a public posting on the account that read "I have a bunch of baby items if any moms to be need them."

15. Detective Alison Nguyen with the Benton County Sheriff's Office issued an emergency request with Facebook, now Meta Platforms Inc, to request records associated with the Facebook profile of Lucy Barrow. Facebook provided information to Detective Nguyen indicating that the Lucy Barrow profile was created on October 25, 2022 at 00:22:45 UTC. The registration internet protocol (IP) address was identified as 2607:fb91:2f08:c891:c431:e452:f173:b495. Detective Nguyen was able to determine that this IP address was owned/maintained by T-Mobile. Detective Nguyen requested an emergency disclosure from T-Mobile and learned that this IP address was assigned to JAMIE WATERMAN, at 1848 Laughlin Ridge Road, Pineville, Missouri. That residence is located approximately .15 miles from a cellular telephone that registered the presence of Ms. Bush's cellular telephone.

16. On October 31, 2022, a call was placed to the McDonald County, Missouri 911, reporting that AMBER WATERMAN was having a medical emergency related to her pregnancy. AMBER WATERMAN met with emergency medical technicians (EMT) at a store located in Longview, Missouri. When AMBER WATERMAN arrived at this location, she provided the EMTs with an unresponsive newborn infant. EMT personnel attempted to revive the infant, but

their efforts were unsuccessful. The infant's remains were transported to the Ozark Funeral Home by EMT personnel.

17. On November 2, 2022, personnel with the Benton County, Arkansas medical examiner's office took custody of the deceased infant and transported the deceased infant from the Ozark Funeral Home to Benton County, Arkansas. The deceased infant was later transported to the Arkansas State Crime Laboratory in Little Rock, Arkansas where an autopsy was performed. During the autopsy, medical examiners examined the placenta that was recovered with the deceased infant and determined that a partial uterus and at least one ovary was attached to the placenta. Medical personnel determined that the deceased infant had been removed from the mother and was not born naturally. DNA from the deceased infant was also collected.

18. On November 1, 2022, Benton County Sheriff's Office detectives arrived at the home of JAMIE and AMBER WATERMAN in connection with the investigation of Ms. Bush's disappearance. While on scene, the detectives noted that a tan Chevrolet pickup truck located on the property contained what appeared to be a large amount of blood within the vehicle.

19. On November 3, 2022, a state search warrant, issued in McDonald County, Missouri, was served at the residence located at 1848 Laughlin Ridge Road, Pineville, Missouri. The search was conducted by members of the McDonald County Sheriff's Office, the Benton County Sheriff's Office, and the FBI. The FBI evidence response team members from the Kansas City and the Little Rock Divisions participated in the search.

20. While the search was being executed, FBI SA Brenan Despain, FBI Task Force Officer Kris Moffit, and Benton County Sheriff's Office Detective Patrick Stuart traveled to JAMIE WATERMAN's place of employment and conducted a non-custodial interview of JAMIE WATERMAN. During this interview, JAMIE WATERMAN advised that on the evening of

October 31, 2022, he discovered that there was blood inside the tan colored Chevrolet pickup truck. JAMIE WATERMAN assumed that the blood came from his wife AMBER WATERMAN due to her pregnancy complications. When JAMIE WATERMAN questioned AMBER WATERMAN about the blood, AMBER WATERMAN did not acknowledge the source of the blood. JAMIE WATERMAN watched AMBER WATERMAN clean the blood from the pickup truck and thereafter, the rags used to clean the blood were burned in a burn barrel located in front of the residence by AMBER WATERMAN. JAMIE WATERMAN then collected trash from the residence and burned the trash in the same burn barrel.

21. JAMIE WATERMAN stated that when Benton County detectives arrived at his residence on November 2, 2022, he was aware that Ms. Bush had been reported as missing. JAMIE WATERMAN learned of this through social media coverage. After the detectives left the residence at approximately 5:00 a.m. on Wednesday, November 2, 2022, AMBER WATERMAN informed JAMIE WATERMAN that she had killed Ms. Bush and then quickly changed her story and said that "Lucy" had killed Ms. Bush.

22. At approximately 6:30 a.m., AMBER WATERMAN led JAMIE WATERMAN to Ms. Bush's body. JAMIE WATERMAN stated that the body was clothed and was lying face-down next to a boat next to the house. The body was covered with a blue tarp. AMBER WATERMAN removed a ring from Ms. Bush's finger and rolled the body onto the blue tarp. JAMIE WATERMAN dragged the body on the tarp to a fire pit behind the residence and AMBER WATERMAN asked JAMIE WATERMAN to get gasoline. JAMIE WATERMAN brought a gallon of chainsaw bar chain oil to AMBER WATERMAN. AMBER WATERMAN proceeded to light the tarp and poured about 1/3 of the oil over the body. AMBER WATERMAN then began collecting wood to throw on the fire. JAMIE WATERMAN stated that he dragged a small sofa

next to the fire and believes that AMBER WATERMAN put the sofa into the fire. After the fire burned for about one hour, AMBER WATERMAN doused the fire with water from a garden hose and JAMIE WATERMAN removed the body from the burn pile.

23. When JAMIE WATERMAN attempted to move the body, the body was still very hot, so JAMIE WATERMAN went to a shed located on the property and retrieved a new tarp. The tarp was placed next to the body and JAMIE WATERMAN rolled the body onto the tarp.

24. After placing the body on the tarp, the body was moved onto the bed of his pickup truck. JAMIE WATERMAN and AMBER WATERMAN drove the body to an area within a short distance from their residence. JAMIE WATERMAN stated that his pickup truck was having transmission problems and could not travel far. After arriving at the spot where the body was to be hidden, JAMIE WATERMAN and AMBER WATERMAN removed the body from the bed of the pickup truck and placed it on the ground. AMBER WATERMAN then removed the tarp. JAMIE WATERMAN and AMBER WATERMAN drove back to their residence where AMBER WATERMAN burned the tarp.

25. JAMIE WATERMAN was asked if he could show the interviewers where the body was taken to, and JAMIE WATERMAN agreed. JAMIE WATERMAN then led agents and detectives to where he and AMBER WATERMAN had left the body. Upon arrival at this location, a charred human body, later identified as Ashley Bush, was discovered.

26. During the search of the residence located at 1848 Laughlin Ridge Road, the FBI evidence response team members discovered a charred human hand and bone fragments located in a burn pile behind the residence.

27. During the autopsy of Ms. Bush, it was determined that she suffered a gunshot wound to the torso.

28. During the course of the investigation, it was discovered that the Facebook profile for "Lucy Barrow," Facebook ID 100087245287695, was active in the "NWA free, giveaway, or pay it forward" Facebook group, user ID **533180143495742**. This private Facebook group was created on August 2, 2015, and has approximately 6,400 members. The group requires its members to be residents of Northwest Arkansas. Due to the group being a private group, I have not been able to review all postings made in the group. Other members of the group have posted screen shots of partial conversations between unknown users and Facebook profile "Lucy Barrow" that I have discovered.

29. On October 26, 2022, an unknown member of the group posted the following message:

　　a.　"Hello, first time mom here, due in January. i'm looking for a small baby swing and maternity clothes. tops 2x-3x jeans and bottoms xl. located in siloam springs. thanks in advance!"

　　b.　The Facebook profile "Lucy Barrow" made the following replies to this posting "I might have some tops in that size," "I'm in Bella Vista but could meet somewhere on Friday".

30. Based on the above, I believe that AMBER WATERMAN used her fictitious "Lucy Barrow" Facebook profile, user ID 100087245287695, to identify and possibly target Ms. Bush and other pregnant females who were members of this Facebook groups. By obtaining information from this Facebook group, I believe that additional witnesses can be identified and interviewed.

## BACKGROUND CONCERNING FACEBOOK[1]

31. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

32. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

33. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

34. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

37. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content

unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

38. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

40. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

41. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

42. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

Page 12 of 16

Case 6:22-sw-02169-DPR   Document 1-1   Filed 12/12/22   Page 12 of 16

44. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

45. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

46. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

47. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged

photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

48.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

49.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including

the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

50. Based on the above facts, I believe probable cause exists for the issuance of a warrant to search the Facebook account described in Attachment A for (1) property that constitutes evidence of the commission of a criminal offense; (2) contraband, the fruits of a crime, or things otherwise criminally possessed; and/or (3) property designated or intended for use or which is or has been used as the means of committing a criminal offense, namely possible violations of Title 18, United States Code, Sections 1201(a) and 3, including but not limited to the items listed in Attachment B.

51. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is located in the Western District of Missouri and is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

52. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

*[Signature]*
STACY LEE MOORE
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me via telephone on the ___12th___ day of December 2022.

*[Signature]*
HONORABLE DAVID P. RUSH
Chief United States Magistrate Judge
Western District of Missouri